UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| JEREMY D. JOHNSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    CIVIL NO. 1:17cv347 |
| | ) |
| NANCY A. BERRYHILL, Acting | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

OPINION AND ORDER

This matter is before the court for judicial review of a final decision of the defendant

Commissioner of Social Security Administration denying Plaintiff's application for Disability

Insurance Benefits (DIB) as provided for in the Social Security Act. 42 U.S.C. §416(I). Section

405(g) of the Act provides, inter alia, "[a]s part of his answer, the [Commissioner] shall file a

certified copy of the transcript of the record including the evidence upon which the findings and

decision complained of are based. The court shall have the power to enter, upon the pleadings

and transcript of the record, a judgment affirming, modifying, or reversing the decision of the

[Commissioner], with or without remanding the case for a rehearing." It also provides, "[t]he

findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be

conclusive. . . ." 42 U.S.C. §405(g).

The law provides that an applicant for disability insurance benefits must establish an

"inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to last for a continuous period of not less

than 12 months. . . ." 42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A). A physical or mental

impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3). It is not enough for a plaintiff to establish that an impairment exists. It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity. *Gotshaw v. Ribicoff*, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); *Garcia v. Califano*, 463 F.Supp. 1098 (N.D.Ill. 1979). It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff. *See Jeralds v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings." *Garfield v. Schweiker*, 732 F.2d 605, 607 (7th Cir. 1984) citing *Whitney v. Schweiker*, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g). "Substantial evidence is defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984) quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); *see Allen v. Weinberger*, 552 F.2d 781, 784 (7th Cir. 1977). "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law." *Garfield*, *supra* at 607; *see also Schnoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law Judge ("ALJ") made the following findings:

1.      The most recent favorable medical decision finding that the claimant was disabled is the decision dated October 14, 2011. This is known as the "comparison point

decision" or CPD.

2.      At the time of the CPD, the claimant had the following medically determinable impairments: psoriasis and psoriatic arthritis; hypertension; hypothyroidism; anemia; and chronic fatigue syndrome. These impairments were found to result in the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a), but he: would need frequent unscheduled breaks; would be unable to sustain sufficient attention and concentration to complete even simple work tasks in a timely manner due to fatigue; and, would be absent or unable to sustain an eight-hour workday two or more times per month on a consistent basis.

3.      As of January 22, 2015, the date the claimant's disability ended, the claimant had not engaged in substantial gainful activity (20 CFR 404.1594(f)(1)).

4.      The medical evidence establishes that, as of January 22, 2015, the claimant had the following medically determinable impairments: currently demyelinating events due to Enbrel-with esotropia which resolved; psoriasis and psoriatic arthritis; hypertension; hypothyroidism; anemia; history of chronic fatigue syndrome, and recent diagnosis of multiple sclerosis. These are the claimant's current impairments.

5.      Since January 22, 2015, the claimant has not had an impairment or combination of impairments which meets or medically equals the severity of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1524, 404.1526, 416.925 and 416.926).

6.      Medical improvement occurred as of January 22, 2015 (20 CFR 404.1594(b)(1) and 416.994(b)(1)(i)).

7.      The claimant's medical improvement is related to the ability to work because it has resulted in an increase in the claimant's residual functional capacity (20 CFR 404.1594(c)(3)(ii) and 416.994(b)(2)(iv)(B)).

8.      Beginning on January 22, 2015, the claimant has continued to have a severe impairment or combination of impairments (20 CFR 404.1594(f)(6) and 416.994(b)(5)(v)).

9.      Beginning on January 22, 2015, based on the current impairments, the claimant has had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except: The claimant is limited to lifting and carrying, pushing and pulling ten pounds frequently and occasionally throughout the work day. The claimant can sit at least six hours in an eight hour work day and stand and/or walk two hours in an eight hour work day. The claimant needs to

alternate postural positions about every 30 minutes while remaining on task. The claimant should not climb ropes, ladders or scaffolds. The claimant can occasionally kneel, crouch, and crawl. The claimant can occasionally balance. The claimant can occasionally bend and stoop in addition to what is required to sit. The claimant can occasionally use ramps and stairs. The claimant should not work upon uneven surfaces. The claimant is limited from concentrated exposure to excessive heat and/or sun such as when working in a boiler room, green house, or when working outside or within a refrigerator. The claimant should avoid concentrated exposure to wetness such as working upon wet and slippery surfaces. The claimant should avoid work within close proximity to open and exposed heights such as upon roofs or near high ledges. The claimant should avoid work within close proximity to open and dangerous machinery such as open flames and fast moving exposed blades. The claimant should not drive motor vehicles or operate heavy machinery. The claimant is otherwise without limitations in avoiding hazards within the work place. The claimant should not perform work requiring fine detail such as small painting or very small parts inspection. The claimant is limited to work within a low stress job defined as requiring only occasional changes in the work setting. The claimant can tolerate predictable changes in the work environment. The claimant can meet production requirements in an environment that allows him to sustain a flexible and goal oriented pace. The claimant is limited from fast paced work such as assembly line production work with rigid or strict productivity requirements.

10.   The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

11.   On January 22, 2015, the claimant was a younger individual age 18-44 (20 CFR 404.1563 and 416.963).

12.   The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.968).

13.   Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

14.   Beginning on January 22, 2015, considering the claimant's age, education, work experience, and residual functional capacity based on the current impairments, the claimant has been able to perform a significant number of jobs in the national economy (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

15.   The claimant's disability ended on January 22, 2015, and the claimant has not become disabled again since that date (20 CFR 404.1594(f)(8) and 416.994(b)(5)(vii)).

(Tr. 12- 21).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to disability benefits. The ALJ's decision became the final agency decision when the Appeals Council denied review. This appeal followed.

Plaintiff filed his opening brief on February 23, 2018. On April 6, 2018, the defendant filed a memorandum in support of the Commissioner's decision to which Plaintiff replied on April 20, 2018. Upon full review of the record in this cause, this court is of the view that the ALJ's decision must be remanded.

Under 42 U.S.C. §§ 405(a) and 423(f), the Social Security regulations set forth a sequential method for determining whether a person's disability has ended. *See* 20 C.F.R. §404.1594(f). The eight steps laid out in this regulation are as follows: The first step is to determine whether the claimant is engaging in substantial gainful activity. If so, the claim is denied. If not, the second step is to determine whether the claimant has an impairment or combination of impairments that meet(s) or equal(s) the severity of a listed impairment. If so, the disability will be found to continue. If not, the third step is to determine whether there has been medical improvement. If there has been in step four the ALJ should determine whether the medical improvement is related to work. Medical improvement is related to the ability to work if it results in an increase in the claimant's capacity to perform basic work activities. 20 CFR 404.194)b)(3). If there has been no medical improvement or the medical improvement is determined not to relate to the ability to work, step five requires the ALJ to consider whether an exception in 20 CFR 404.1594(d) and (3) or 416.994(b)(3) and (b)(4). If one of the first group of exceptions applies, the analysis proceeds to the next step. If one of the second group applies, the claimant's disability ends. Step six requires a determination as to whether the claimant still has

any severe impairments, impairments which significantly limit the claimant's ability to do basic work activities. If severe impairments are present, the evaluation proceeds to the next step. If not, the claimant's disability ends. The seventh step is to determine whether the claimant has an impairment which precludes the performance of past relevant work. 20 C.F.R. §404.1594(f). If not, the claim is denied. *Id.* If so, the eighth and final step is to determine whether the claimant's impairments prevent the performance of any other work, considering residual functional capacity, age, education, and work experience. *See* 20 C.F.R. § 404.1594 (f)(8). The burden of proof is on the Commissioner to demonstrate other work exists in significant numbers in the national economy that the claimant can do, given the residual functional capacity, age, education, and work experience. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

Plaintiff received a Fully Favorable decision from ALJ Jennifer Fisher on October 14, 2011, granting him disability benefits with a disability onset date of July 31, 2009. (Tr.129-138; 139) On January 22, 2015, cessation notices were issued for both Title II and Title XVI benefits, with the Social Security Administration citing improved health since their last review which enabled Plaintiff to be able to work. (Tr. 144-147; 148-151) Plaintiff submitted a request for reconsideration of his disability cessation on February 3, 2015. (Tr.152). Plaintiff was granted a hearing with a Disability Hearing Officer on September 29, 2015. (Tr 153-161). The Disability Hearing Officer, Ms. Stacey Smoot, issued a decision on October 19, 2015, in which she found Plaintiff to continue to not be disabled under Social Security rules. (Tr. 162-170). Plaintiff then requested a hearing by an ALJ on October 22, 2015. (Tr. 176; 177-189). On March 22, 2016, Plaintiff appeared for a hearing in Fort Wayne, IN, before Administrative Law Judge William D. Pierson of the Fort Wayne, IN, Office of Disability Adjudication and Review (ODAR). *Id.* at

98-114. ALJ Pierson continued the hearing date in order for Plaintiff to obtain representation, as he appeared at the hearing without an attorney. *Id.* On May 26, 2016, Plaintiff re-appeared, still unrepresented, in Fort Wayne, IN, before ALJ Pierson. (Tr. 30-68). On September 6, 2016, ALJ Pierson issued an Unfavorable Decision, proclaiming the Plaintiff, since January 22, 2015, able to perform a significant amount of jobs in the national economy. (Tr. 7-29). Plaintiff filed a request for review by the Appeals Council of the Office of Disability Adjudication and Review, and the Appeals Council denied the request on June 12, 2017. (Tr. 1-6). Plaintiff then timely filed a complaint with this court.

Plaintiff was born on August 22, 1991. (Tr. 288) At the time of his formal cessation hearing date, he was 24 years of age. *Id.* Plaintiff completed high school. Plaintiff has never engaged in substantial gainful activity. (Tr. 251).

On September 13, 2013, Plaintiff presented to Dr. Rosemarie Jeffery for a rheumatology consult, per the referral of Dr. Priya Sadanadan, complaining mainly of fatigue. (Tr. 354) Dr. Jeffery performed a physical exam, which returned normal save for some excoriated psoriatic skin on the right foot. (Tr. 356). Dr. Jeffery diagnosed psoriatic arthritis "under excellent control at this point per my examination today," psoriasis, and chronic fatigue which "apparently has improved with treatment of his psoriatic arthritis and hypothyroidism. This patient however has a quite sedentary lifestyle. I discussed with him and his mother the benefits of beginning some physical activities. I think vocational training should also be considered." (Tr. 356). At a return visit with Dr. Jeffery on December 12, 2013, Jeremy had no complaints. (Tr. 360). Dr. Jeffery noted, in regards to Jeremy's psoriatic arthritis diagnosis that "this condition is basically in remission on Enbrel." (Tr. 361).

Plaintiff returned to Dr. Jeffery on June 12, 2014, with no complaints or pain. (Tr. 363). Dr. Jeffery noted that both his psoriatic arthritis and psoriasis were doing well on weekly Enbrel, and also "I encourage the patient to continue his yoga but incorporate aerobic exercise such as walking. He will try to work up to a half an hour of walking at least every other day." (Tr. 364). On September 23, 2014, Plaintiff returned to Dr. Jeffery, complaining of a right palsy, resulting in seeing double objects at a distance and in his peripheral vision. (Tr. 366) On exam, Dr. Jeffery noted lag in the right temporal gaze affecting the right eyeball, diagnosed left sixth nerve palsy, and referred Plaintiff to a neuro-ophthalmologist. (Tr. 368).

Plaintiff presented to Dr. Kevin Lai, a neuro-ophthalmologist, on October 22, 2014. (Tr. 376-381) Dr. Lai summarized this extensive visit and plans in a note to Dr. Mel Frecker on October 31, 2014. (Tr. 370). He noted his examination revealed "[Plaintiff's]  visual acuity with correction is 20/20 in each eye. His pupils are isocoric and normally reactive with no afferent pupillary defect. His muscle balance and motility examination demonstrates estropia worse in right gaze with a trace abduction deficit in the right eye. The rest of his neuro-ophthalmologic examination is normal."(Tr. 370). Dr. Lai diagnosed estropia, and instructed Plaintiff to wear a "Fresnel prism" out over the left eye to help decrease diplopia. (Tr. 371).

An MRI of Plaintiff's brain, obtained on October 28, 2014, revealed "punctuate long TR hyperintensities present in the periventricular white matter with two tiny lesions on the right and one on the left." (Tr. 372) The interpreting physician noted these to be "of uncertain etiology or clinical significance." *Id*.

From March 25, 2015, to March 29, 2015, Plaintiff was an inpatient at Community Hospital in Anderson, Indiana, after presenting to Dr. Mark Cohen complaining of numbness and

tingling in his arms and legs, coupled with "his left eye was, for the most part, stuck in an adducted position suggestive again of a 6th nerve palsy" causing double vision. (Tr. 398; 422-426) Dr. Cohen made the decision to admit Plaintiff for observation, IV steroid treatment, and to begin testing for multiple sclerosis. (Tr. 399-400). Dr. Christopher Rocco discharged Plaintiff home on March 29, 2015, with a diagnosis of clinically isolated syndrome. (Tr. 395). While inpatient, MRI's of Plaintiff's cervical spine and lumbar spine both returned negative. (Tr. 402; 406). An MRI of his head revealed "Tiny nonspecific white matter lesions as described above which may be related to the suspected diagnosis of multiple sclerosis." (Tr. 405).

On April 14, 2015, Plaintiff returned to Dr. Cohen to discuss the results of lumbar puncture and MRI, also complaining of new numbness in his legs, arms, and back. (Tr. 418). After thorough exam and review of testing, Dr. Cohen diagnosed "Demyelination likely secondary to e[n]brel, which has since be[en] discontinued." (Tr. 421). He further stated that the Enbrel dose had been stopped, and that there would no longer be treatment with disease modifying therapy for MS. *Id.*

On June 2, 2015, Plaintiff presented to Dr. David Mattson at the IU MS Center for consultation about a recent possible MS diagnosis, per referral from Dr. Cohen. (Tr. 441; 597) After a thorough exam and record review, Dr. Mattson noted "Since all of his inflammatory demyelinating events have occurred while he has been on Enbrel, which is one of the TNF agents associated with inflammatory demyelination, I think the benefit of doubt goes to the idea that this could still all be Enbrel-related and that by stopping it, he may not have any more recurring demyelinating events. He certainly needs to stay off of TNF active agents from this point forward." (Tr. 443). Dr. Mattson also stated "If new lesions are occurring off of Enbrel that would

then lead to a more likely multiple sclerosis diagnosis, and the need to get him on to more typical maintenance immunotherapy for multiple sclerosis potentially." (Tr. 443-444).

On August 13, 2015, Plaintiff returned to Dr. Jeffery, complaining of continued numbness and tingling in his arms and legs which tended to wax and wane, as well as hip stiffness in the evenings. (Tr. 445). After exam, Dr. Jeffery diagnosed 6th nerve palsy and sensory dyesthesias while on Enbrel, and noted "At this point I find no need for disease modifying agents." (Tr. 447).

On September 16, 2015, Dr. Lai penned a note to the Disability Determination Bureau in which he stated "Based on his [Plaintiff's] findings, as long as his diplopia is well-controlled, he should not have any functional limitations related to sitting, standing, walking, lifting, carrying, handling objects, hearing, speaking, and traveling. If he has persistent double vision, this would limit his ability to perceive depth and use both eyes together. This would limit his ability to drive and read. However, at his last examination he appeared to have no double vision symptoms." (Tr. 451).

On December 10, 2015, Plaintiff presented to Dr. Jeffery, complaining of stiffness in his hands and legs, psoriasis rash, numbness and tingling of hands and feet, and occasional double vision. (Tr. 464) After exam, Dr. Jeffery diagnosed worsening psoriasis, and CNS demyelinating disorder due to Enbrel, noting the need to keep Plaintiff off all TNF alpha inhibitors. (Tr. 466).

On May 5, 2016, Plaintiff presented to Dr. David Mattson, the Director of the Indiana University Multiple Sclerosis Center and a Professor of Neurology, in "urgent followup" of his MS symptoms. (Tr. 576) Dr. Mattson stated his hopes of keeping Plaintiff off of Enbrel, "would not have any further events of inflammatory demyelination… Unfortunately, now a year off of Enbrel, he has had a new event and accompanied by new enhancing lesion in the spinal cord to

explain the event, so this has now been declared as multiple sclerosis. The inflammatory demyelination caused by Enbrel has now taken on a life of its own as MS." (Tr. 577). Dr. Mattson noted desiring trials of Methotrexate and Copaxone for MS management, and encouraged Plaintiff to reach out to Indiana Multiple Sclerosis support groups. *Id.*

On May 9, 2016, Dr. Mattson penned a note which stated the following:

Mr. Jeremy Johnson is currently under my care and has been under my care since June 02, 2015 for the treatment and management of his relapsing- remitting multiple sclerosis (MS) (ICD.10 G35). Multiple sclerosis is a chronic, unpredictable, and progressive disease in which there is no known cure, only medications to manage the symptoms and slow the progression of the disease. Mr. Johnson was initially diagnosed with inflammatory demyelination caused by Enbrel which was being used to treat his rheumatoid arthritis. A repeat MRI on April 20, 2016 showed an old lesion at C2 had gotten larger when compared to the MRI on March 26, 2015 and a new lesion at C4 that is small and enhancing that was not present on the September 2015 MRI. Mr. Johnson has now met the criteria for an MS diagnosis and was started on an immunotherapy to slow progression and disability of his disease. Mr. Johnson currently experiences on going MS fatigue, numbness and sensory difficulties from the neck down and intermittent diplopia when overheated.

(Tr. 574)

As noted above, on May 26, 2016, Plaintiff appeared for a hearing in Fort Wayne, Indiana, before ALJ William Pierson of the Fort Wayne, Indiana Office of Disability Adjudication and Review (ODAR). (Tr. 30-68) Also present were the Plaintiff's mother, Lisa Johnson, and Vocational Expert Sharon Ringenberg. Plaintiff was not represented by counsel at the hearing. Plaintiff testified he drove one to two times a week to the store or doctor's appointments, and drove so little due to the double vision he experienced. (Tr. 38-39). Plaintiff explained that he has issues with standing any amount of time over an hour or sitting for 45 minutes to an hour due to leg stiffness and tightness. (Tr. 40). Plaintiff testified that "all the numbness and the fatigue" as the reasons he couldn't work, further noting numbness in his hands all the way up to his shoulders

and his hips all the way down. (Tr. 43-44). Plaintiff stated he endured psoriatic lesions on his body, as well as psoriatic arthritis which caused stiffness in his hands and feet. (Tr. 45). Plaintiff explained that he has  persisting double vision maladies, accompanied by weakness in his arms and legs which "gets worse the later the day goes on." (Tr. 47). Plaintiff testified to feeling tired "all throughout the day every day" made worse by activity, and that this fatigue, in addition to his numbness and arthritis, would keep him from working a sedentary job. (Tr. 51). When questioned by the ALJ if he could do a job where he sat down for 30 minutes at a time and then stood for 30 minutes at a time then sat back down for 30 minutes, Plaintiff replied he wasn't sure, as "It's just, well, with the MS it just depends because some days can be going better than others." (Tr. 53). Plaintiff's mother, Lisa Johnson, then testified. She relayed a significant amount in information regarding Plaintiff and his ailments, down to the details of him needing special arrangements to even graduate high school. (Tr. 54-59).  Ms. Johnson testified to Plaintiff's tribulations with concentration and forgetfulness, which would further impede his abilities to work. (Tr. 67).

   ALJ Pierson remarked he would order updated records from Drs. Mattson, Borgenheimer, and Jeffery, and then turned his questioning to the Vocational Expert Sharon Ringenberg. (Tr. 61). The ALJ presented a sedentary hypothetical with several additional limitations, which the VE stated that hypothetical individual could perform the occupations of Mail Sorter (DOT code 239.687-014), Eyeglass Frame Polisher (DOT code 713.684-038), and Charge Account Clerk (DOT code 205.367-010). (Tr. 62-64). Ms. Ringenberg testified to typical on task requirements of 80-85% of the workday, which equivocated to two to five minutes of time per hour off task, and then described a tolerance range for absences between one to three days a month, with an individual who missed two days or more a month consistently being unable to maintain

competitive employment. (Tr. 66).

On September 9, 2016, ALJ Pierson issued an unfavorable decision resulting in the cessation of Plaintiff's disability benefits. (Tr. 7-29) At Step Two, the ALJ concluded that the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926. *Id*. At Step Three, ALJ Pierson found that "Medical improvement occurred as of January 22, 2015" and that, as of that date, "there had been a decrease in medical severity of the impairments present at the time of the CPD." (Tr. 14). At Step Four, the ALJ concluded this medical improvement did relate to Plaintiff's ability to work as it impacted the residual functional capacity. At Step Six, the ALJ further found that, as of January 22, 2015, Plaintiff had the following medically determinable impairments: currently demyelinating events due to Enbrel-with estropia which resolved; psoriasis and psoriatic arthritis; hypertension; hypothyroidism; anemia; history of chronic fatigue syndrome, and recent diagnosis of multiple sclerosis. *Id*. At Step Seven, ALJ Pierson found Plaintiff had no past relevant work and that, beginning January 22, 2015, Plaintiff retained a residual functional capacity to perform sedentary work except: the claimant is limited to lifting and carrying, pushing and pulling ten pounds frequently and occasionally throughout the work day. Plaintiff can sit at least six hours in an eight hour work day and stand and/or walk two hours in an eight hour work day. Plaintiff needs to alternate postural positions about every 30 minutes while remaining on task. Plaintiff should not climb ropes, ladders, or scaffolds. Plaintiff can occasionally kneel, crouch, and crawl. Plaintiff can occasionally balance. Plaintiff can occasionally bend and stoop in addition to what is required to sit. Plaintiff can occasionally use

ramps and stairs. Plaintiff should not work upon uneven surfaces. Plaintiff is limited from concentrated exposure to excessive heat and/or sun such as when working in a boiler room, green house, or when outside. Plaintiff is limited from concentrated exposure to excessive cold as when working outside or within a refrigerator. Plaintiff should avoid concentrated exposure to wetness such as when working upon wet and slippery surfaces. Plaintiff should avoid work within close proximity to open and exposed heights such as upon roofs or near high ledges. Plaintiff should avoid work within close proximity to open and dangerous machinery such as open flames and fast moving machinery. Plaintiff is otherwise without limitations in avoiding hazards in the workplace. Plaintiff should not perform work requiring fine detail such as small painting or very small parts inspections. Plaintiff is limited to work within a low stress job defined as requiring only occasional decision making and only occasional changes in the work setting. Plaintiff can tolerate predictable changes in the work environment. Plaintiff can meet production requirements in an environment that allows him to sustain a flexible and goal oriented pace. Plaintiff is limited from fast paced work such as assembly line production work with rigid or strict productivity requirements. (Tr.14-15, 20). At Step Eight, the ALJ determined Plaintiff could perform a significant number of jobs that exist in significant numbers in the national economy, including Mail Sorter (DOT code 239.687-014), Eyeglass Frame Polisher (DOT code 713.684-038), and Charge Account Clerk (DOT code 205.367-010). (Tr. 21). Plaintiff's application for benefits were denied upon this finding, and ALJ Pierson determined Plaintiff to not be under a disability, as defined in the Social Security Act, from January 22, 2015 through the date of the decision. (Tr. 21-22).

    In support of remand, Plaintiff first argues that the ALJ's finding that Plaintiff

experienced "medical improvement" is not supported by substantial evidence or the relevant legal

standards. Plaintiff claims that the ALJ failed to consider the fact that Plaintiff's new impairments

stemming from multiple sclerosis were the result of the treatment of his sclerotic arthritis, the

basis of his disability at the comparison point date[1]. Social Security's regulations require that, in

considering whether a Plaintiff has experienced medical improvement, the ALJ will consider

whether there is:

> [A]ny decrease in the medical severity of your impairment(s) which was present at
> the time of the most recent favorable medical decision that you were disabled or
> continued to be disabled. A determination that there has been a decrease in
> medical severity must be based on improvement in the symptoms, signs, and/or
> laboratory findings associated with your impairment(s). Medical improvement is
> related to your ability to work if there has been a decrease in the severity, as
> defined in paragraph (b)(1) of this section, of the impairment(s) present at the time
> of the most recent favorable medical decision and an increase in your functional
> capacity to do basic work activities as discussed in paragraph (b)(4) of this section.
> " 20 CFR § 404.1594(b)(1) and (3).

Such a determination must be supported by substantial evidence and it has been long established

that the "Commissioner bears the burden in a continuing disability case of showing that the

claimant has experienced medical improvement such that he can engage in substantial gainful

activity." *Hickey v. Colvin*, No. 13 C 7857, 2015 U.S. Dist. LEXIS 82435 (N.D. Ill. June 25,

2015), citing 20 C.F.R. § 404.1594(b)(5); *Mables v. Sullivan*, 812 F. Supp. 886, 888 (C.D. Ill.

1993). Meaningful judicial review requires an adjudicator to build a logical and accurate bridge

between the evidence and his conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009);

*Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). While the ALJ need not discuss every piece

---

[1] The comparison point decision, in which an ALJ assessed a residual functional capacity which resulted in Plaintiff's being awarded disability benefits, was issued in 2011. The ALJ based her residual functional capacity largely on Plaintiff's sclerotic arthritis and resulting symptoms of joint pain, weakness, and fatigue. (Tr. at 136-137)

of evidence in the record, he must confront the evidence which does not support his conclusions and explain why it was rejected. *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004); *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2003).

In the present case, as noted above, Plaintiff contends that the ALJ failed to give adequate consideration to the fact that Plaintiff's new severe symptoms resulting from multiple sclerosis were actually caused by the treatment of his sclerotic arthritis which, argues Plaintiff, resulted in an errant finding of medical improvement as to the severity of Plaintiff's condition. Plaintiff claims that the ALJ failed to consider Plaintiff's treating neurologist's statement that his multiple sclerosis was the result of inflammatory demyelination, a side effect of the medication used to treat his sclerotic arthritis, "Unfortunately, now a year off of Enbrel, he has had a new event and accompanied by new enhancing lesion in the spinal cord to explain the event, so this has now been declared as multiple sclerosis. The inflammatory demyelination caused by Enbrel has now taken on a life of its own as MS." (Tr. 577). Plaintiff argues that the ALJ's failure to address this medical opinion caused him to consider Plaintiff's improvement to his sclerotic arthritis as sufficient evidence of medical improvement without really considering how the symptoms and impairments caused by the resulting multiple sclerosis might equate his condition to what it was at the comparison decision point.

Plaintiff further argues that rather than assessing the combined severity of Plaintiff's sclerotic arthritis and multiple sclerosis, the ALJ's decision relies on the fact that Plaintiff's new multiple sclerosis symptoms were somewhat different than those caused by sclerotic arthritis at the time of his previous decision, and fails to adequately articulate how they resulted in a less impaired functional capacity than that which was assessed at the comparison point decision. In

determining that his new assessed residual functional capacity represented Plaintiff's true limitations at the time of the decision, and a medical improvement from the comparison point decision in 2011, the ALJ wrote, "Dr. Jeffery noted the claimant's arthritis was doing very well, but he needed to proceed with treatment for multiple sclerosis (Exhibit B13F/4-6).The above facts certainly suggest severe symptoms but also establish medical improvement in the conditions at the comparison point decision and also do not appear to support limitations of function greater than those reflected in the residual functional capacity." (Tr.17)

Plaintiff argues that such a rationale relies on the fact that Plaintiff's arthritis symptoms somewhat resolved but fails to provide adequate explanation of why his new impairments which stemmed from multiple sclerosis that resulted from the treatment of his sclerotic arthritis were not equally severe to Plaintiff's impairments at the time of the comparison point decision. Plaintiff further claims that the ALJ's discussion fails to provide any logical rationale why the addition of a new neurological condition, which resulted from treatment of the condition which was the primary basis for the finding of disability at the comparison point decision, somehow could represent medical improvement which affected Plaintiff's ability to work. The ALJ's decision acknowledges Plaintiff's newfound multiple sclerosis symptoms of double vision, joint stiffness, numbness and tingling in all extremities, and difficulty sleeping. (Tr.15-20) It further acknowledges that Plaintiff still experienced debilitating fatigue as a result of multiple sclerosis, a symptom which the comparison decision of disability was largely based, and that he experienced "a worsening of symptoms beginning in March of 2016.". (Tr. 17, 19, 136-137)

However, instead of explaining how Plaintiff could experience these new "worsening" symptoms and still experience "medical improvement," the ALJ simply relied on a resolution of

some of Plaintiff's previous sclerotic arthritis symptoms as evidence the improvement occurred, "Dr. Jeffery noted the claimant's arthritis was doing very well," "no significant joint pain," "5/5 strength in both legs and normal gait." (Tr. 17) While the two impairments caused different symptoms, Plaintiff's most severe condition at the time of current decision, MS, resulted from his treatment of sclerotic arthritis and the ALJ was required to address how those symptoms did or did not affect medical improvement. Instead, the ALJ essentially found medical improvement solely on the basis of the resolution of Plaintiff's sclerotic arthritis symptoms without explaining why his new multiple sclerosis symptoms were not equally severe. This failure to provide such an explanation represents a structural deficiency in the ALJ's requisite logical and accurate bridge between the evidence and his conclusion of medical improvement related to Plaintiff's ability to work and certainly does not bear her burden. Remand is necessary so the ALJ may articulate why a finding of medical improvement was justified despite Plaintiff's new diagnosis of multiple sclerosis and its resulting impairments.

The Commissioner argues that because Plaintiff's diagnosis of multiple sclerosis came just a month prior to his administrative hearing, the evidence did not detract from the ALJ's decision that Plaintiff's condition had improved.   As Plaintiff points out, however, it appears as though the ALJ was reversing the burden of proof on this issue.   The burden is on the Commissioner to prove that Plaintiff had improved.   Plaintiff need not prove that he had not improved.   As the ALJ noted, the medical evidence clearly showed that Plaintiff's symptoms had not yet begun to improve, and that uncertainty remained as to whether improvement would occur within the next six to twelve months.   Clearly, the evidence shows that Plaintiff had experienced a painful episode as a result of his impairments and the medication he used to treat his sclerotic

arthritis. Thus, contrary to the Commissioner's position, the evidence reflects a worsening of Plaintiff's condition, not an improvement. In fact, as Plaintiff recognizes, Plaintiff experienced several medical episodes which ultimately resulted in the diagnosis of multiple sclerosis, which at least arguably is a more debilitating condition than the one he was initially determined to be disabled by, sclerotic arthritis. For the reasons detailed above, remand is necessary.

Next, Plaintiff argues that the ALJ has committed reversible error in dismissing Plaintiff's allegations specifically relating to the intensity, persistence, and limiting effects of his multiple sclerosis symptoms: extremity numbness, tingling, and extreme fatigue. Plaintiff concludes that the ALJ's error resulted in a residual functional capacity which was less restrictive than it may have been had the ALJ fairly considered Plaintiff's multiple sclerosis-based limitations. In assigning a Residual Functional Capacity, the ALJ must consider the claimant's testimony, the objective medical evidence, and opinions from medical sources. 20 C.F.R. § 404.1545(3). A court will not disturb the weighing of credibility so long as the determinations are not "patently wrong." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000); *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (citing *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004)). When the credibility determination rests on "objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision." *Clifford*, 227 F.3d at 872. A court may reverse a credibility determination if it finds that the rationale provided is "unreasonable or unsupported." *Prochaska*, 454 F.3d at 738 (citing *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006)). "[O]rdinarily a trier of fact's credibility finding is binding on an appellate tribunal. But not if the finding is based on errors of fact or logic." *Allord v. Barnhart*, 455 F.3d 818,821 (7th Cir. 2006).

In dismissing Plaintiff's allegations of fatigue, numbness and tingling in the extremities, the ALJ wrote, "The claimant alleged symptoms of numbness fatigue, and weakness in all arms and legs. The claimant generally denied such symptoms in office visits (Exhibit B13F/ 4, 6; B12F), except in May 2016, the claimant reported increased numbness since March." (Tr. 18) Plaintiff argues that the notion that Plaintiff generally denied these symptoms is not true, and that fact is demonstrated in the ALJ's own decision. In January 2015, the ALJ noted, Plaintiff experienced "numbness in his legs, arms, and back." (Tr. 17) In August of 2015, Plaintiff reported that numbness and tingling in his arms and legs "waxed and waned" and that he experienced joint stiffness. (Tr. 17) He again complained of tingling and numbness, fatigue, and trouble sleeping in October of 2015. (Tr. 17) In December, Plaintiff reported continued "stiffness in his hands and legs." (Tr. 17-18) Further, the ALJ's decision omits the fact Plaintiff was hospitalized with numbness and tingling in his arms in legs from March 25, 2015 to March 29, 2015. (Tr. 398, 422-426) Clearly, the notion that Plaintiff did not complain of numbness and tingling until May of 2016 is simply inaccurate and a patently wrong reason to dismiss the intensity, persistence, and limiting effects of those impairments.

Regarding Plaintiff's fatigue, the ALJ wrote, "the records further did not substantiate the claimant's allegations of severe fatigue." (Tr. 20) Plaintiff claims that this is patently wrong and fails to demonstrate the improvement of Plaintiff's fatigue, one of the bases on which he was found disabled in the first place. Given that the burden of demonstrating medical improvement lies with the Commissioner when ceasing a claimant's benefits, the ALJ was required to demonstrate medical improvement in Plaintiff's energy level. 20 C.F.R. § 404.1594(b)(5). Plaintiff points out that simply stating that the record does not support Plaintiff's allegation of

fatigue does not meet the Commissioner's burden of proof. It does not explain what has changed since the first ALJ found Plaintiff's allegations of debilitating fatigue to be wholly credible. Further, Plaintiff underwent a multitude of diagnostic testing which confirmed he had developed multiple sclerosis since his initial hearing in 2011, a disease known to cause debilitating fatigue. (Tr. 433-434, 577) Clearly, without some explanation beyond the ALJ's finding that Plaintiff's allegations of fatigue were generally inconsistent with the record, the Commissioner has not satisfied his burden of showing medical improvement in this area.

The Commissioner argues that Plaintiff needed to point to medical records indicative of "daytime somnolence or deficits in functioning related to fatigue or loss of sleep." Again, however, the Commissioner is reversing the burden of proof. Plaintiff was initially found disabled, in part, on the basis of his extreme fatigue. Therefore, the Commissioner needed to put forward substantial evidence which supported a resolution of that symptom. As the Commissioner failed to do so, remand is warranted.

Conclusion

On the basis of the foregoing, the decision of the ALJ is hereby REMANDED for further proceedings consistent with this Opinion.


 Entered: May 24, 2018.


                                        s/ William C. Lee
                                        William C. Lee, Judge
                                        United States District Court